(2008)
Rene JUNK, as Parent and Next Best Friend of T.J., a minor, Plaintiff,
v.
TERMINIX INTERNATIONAL COMPANY LIMITED PARTNERSHIP; The Dow Chemical Company; Dow AgroSciences, LLC; and Jim Breneman, an individual, Defendants.
No. 4:05-cv-06008-JAJ.
United States District Court, S.D. Iowa, Central Division.
October 31, 2008.

ORDER
JOHN A. JARVEY, District Judge.
This matter comes before the Court pursuant to Defendants The Dow Chemical Company and Dow AgroSciences LLC's (collectively "Dow AgroSciences") October 8, 2008, Motion in Limine to exclude the opinions of Dr. Richard Fenske, Ph.D., MPH, and Dr. Cynthia Bearer's specific causation opinions derived from Dr. Fenske's report. [Dkt. 331]. Defendant Terminix International Company Limited Partnership ("Terminix") filed a joinder to Dow AgroSciences' motion on October 9, 2008. [Dkt. 334]. Plaintiff Rene Junk, as Parent and Next Best Friend of T.J., a minor ("Junk"), responded to Dow Agro-Sciences' motion on October 27, 2008. [Dkt. 351].
Through this final expert witness, Junk was required to reliably demonstrate that the Junk's exposure to chlorpyrifos "exceeded safe levels." Bonner v. ISP Technologies, Inc., 259 F.3d 924, 931 (8th Cir. 2001). Dr. Fenske failed to make such a demonstration. While Dr. Fenske reasonably estimates the amount of chlorpyrifos that was applied inside the Junk home, his opinions regarding the Junks' exposure and dosage suffer from a number of serious flaws. First, in rendering his opinions in this matter, Dr. Fenske did not apply the scientifically reliable model for estimating exposure that he typically utilizes in his research and teaching. Second, he based his opinion solely on the amount of chlorpyrifos applied to the Junk home without considering the size of the house, the areas treated, and the amounts applied to the exterior of the home. Third, Dr. Fenske attempted to compare the circumstances of chlorpyrifos exposures in the Junk home with the circumstances of exposures that occurred in certain academic studies. These comparisons are not reliable because they lack a sufficient factual basis. For these reasons, which are more fully explained below, Dow AgroSciences Motion in Limine is granted in its entirety.

I. FACTUAL HISTORY[1]
In February of 1992, Plaintiff Rene Junk became pregnant with her first child. During Rene Junk's pregnancy, Terminix applied the pesticide Dursban L.O. ("Dursban") to cracks and crevices in the interior of the Junk home to treat spider infestation. Dursban, a trademark of Dow Agro-Sciences, contains the organophosphate chlorpyrifos. Following Tyler Junk's birth on August 28, 1992, Terminix continued to regularly apply Dursban to the Junk home. The last application of Dursban to the Junk home occurred on September 15, 1994.
On June 25, 1992, doctors discovered a chorioangioma, or a large tumor, in Tyler Junk's umbilical cord. Throughout her pregnancy, Rene Junk suffered a number of symptoms, including nausea, vomiting, diarrhea, and skin rash. On August 25, 1992, three days prior to Tyler Junk's birth, doctors discovered that he suffered from an enlarged heart and tachycardia, or a rapid heart rate. On August 28, 1992, Rene Junk gave birth to Tyler Junk. Tyler Junk suffered from tachycardia and had an enlarged heart and liver at the time of birth. The birth was approximately two months premature. Following the birth of her son, Rene Junk was diagnosed with pulmonary edema.
Throughout the first months of his life, Tyler Junk suffered from fussiness, loss of appetite, difficulty with breathing, and a runny nose. From the time that Tyler Junk was approximately six months old, Rene Junk observed that he appeared to exhibit symptoms of developmental delay. Tyler Junk was later diagnosed with cerebral palsy, and currently suffers from significant developmental delay.
On October 3, 2005, Rene Junk, on behalf of her minor son, filed a lawsuit against Dow AgroSciences, Terminix, and other defendants in Iowa state court. [Dkt. 1]. Junk alleged that her son suffered physical, neurological, and psychological injuries as a result of exposure to chlorpyrifos, which is contained in Dursban. On November 4, 2005, Defendants filed a notice removing the lawsuit to the United States District Court for the Southern District of Iowa. [Dkt. 1].

II. PROCEDURAL HISTORY
On August 10, 2006, this Court issued the initial scheduling order and discovery plan in this matter. [Dkt. 56]. After granting an extension, the Court set Junk's initial expert witness disclosure deadline for June 18, 2007. [Dkt. 80]. In compliance with that deadline, Junk disclosed several expert witnesses, including Dr. Cynthia Bearer, M.D., Ph.D. and Dr. Mohamed Abou-Donia, Ph.D. Junk did not disclose Dr. Fenske as an expert witness on or before the disclosure deadline.
Terminix and Dow AgroSciences deposed Dr. Abou-Donia and Dr. Bearer on January 17, 2008, and January 23, 2008, respectively. During their depositions, both Dr. Abou-Donia and Dr. Bearer referred to a January 15, 2008, preliminary report completed by Dr. Fenske. The preliminary report contained an exposure analysis by Dr. Fenske. On March 12, 2008, Junk disclosed Dr. Fenske as an expert witness. The disclosure included Dr. Fenske's revised report, also dated March 12, 2008. Dr. Fenske's revised report is identical to the preliminary report except that it contains Dr. Fenske's responses to criticisms of his qualifications.
Dr. Fenske is a professor in the Department of Environmental and Occupational Health Sciences in the School of Public and Community Medicine at the University of Washington. [Dkt. 161, Junk App., p. 855]. He is also the associate chair of that department. [Dkt. 161, Junk App., p. 855]. Dr. Fenske is the director of the Pacific Northwest Agricultural Safety and Health Center, a federally-funded initiative that addresses occupational health and safety in the farming, forestry, and fishing industries. [Dr. Fenske Depo., p. 60]. Dr. Fenske received his MPH in environmental health sciences from the University of California, Berkeley, in 1978, and his Ph.D. in environmental health sciences from the same institution in 1984. [Dkt. 161, Junk App., p. 855]. Dr. Fenske is an expert in environmental health sciences generally, with exposure science as a speciality within that field. [Dr. Fenske Depo., p. 59].
In his preliminary and revised reports and in his first declaration, Dr. Fenske provided the following opinions:
a. The nature and safety of Dursban products applied at the Junk residence were misrepresented by Terminix employees.
b. Dursban applications at the Junk residence were made by unqualified personnel.
c. Dursban applications at the Junk residence were made improperly, resulting in overuse of these products.
d. Chlorpyrifos, the active ingredient in Dursban products, was known to be a hazardous neurotoxic chemical agent at the time of these applications, and was the subject of regulatory scrutiny.
e. Inadequate data existed at the time of the applications to claim that no deleterious health effects might result from use in residences.
f. Mrs. Rene Junk was almost certainly exposed during her pregnancy to levels of chlorpyrifos sufficiently high to produce neurologic deficits in the child that she carried.
g. Tyler Junk was almost certainly exposed to levels of chlorpyrifos during early childhood that exceeded the U.S. Environmental Protection Agency's current regulatory concern levels.
[Dkt. 161, Junk App., p. 996]. Dr. Fenske does not purport to offer an opinion that exposure to chlorpyrifos caused Tyler Junk's condition. Instead, Dr. Fenske's exposure analysis provides a basis for Dr. Bearer's specific causation opinion. Dr. Bearer testified that she relied on Dr. Fenske's exposure analysis to conclude that Tyler Junk was exposed to a quantity of chlorpyrifos that exceeded safe levels. [Dr. Bearer Depo., pp. 58-60; Dr. Bearer Decl., ¶ 16].
On May 12, 2008, Terminix and Dow AgroSciences filed motions to exclude the expert testimony of Dr. Bearer and Dr. Abou-Donia pursuant to Federal Rule of Evidence 702. [Dkt. 140, 143]. On the same date, Terminix and Dow AgroSciences also moved to strike the testimony and expert report of Dr. Fenske on the grounds that it was untimely disclosed pursuant to Federal Rules of Civil Procedure 26 and 37. [Dkt. 140, 142]. On August 15, 2008, 2008 WL 5142188, the Court denied Terminix's and Dow Agro-Sciences' motions to strike the expert testimony and report of Dr. Fenske. [Dkt. 255]. On September 11, 2008, 2008 WL 4192540, the Court granted in part and denied in part Dow AgroSciences' and Terminix's motions regarding the expert testimony of Dr. Abou-Donia, thereby excluding Dr. Abou-Donia's expert testimony regarding specific causation. [Dkt. 316]. On the same date, the Court denied Dow AgroSciences' and Terminix's motions regarding Dr. Bearer's expert testimony. [Dkt. 317]. In permitting Dr. Bearer's specific causation opinion, the Court acknowledged that Dr. Bearer's opinion was based on Dr. Fenske's exposure analysis. The Court stated that it would reexamine admissibility of Dr. Bearer's specific causation opinion once it determined whether Dr. Fenske's exposure analysis was admissible pursuant to Rule 702.

III. STANDARD OF ADMISSIBILITY
Federal Rule of Evidence 702, along with the tenets of Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), govern the admissibility of expert testimony in federal court. Rule 702 states:
If scientific, technical, or otherwise specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Fed.R.Evid. 702. "District courts must ensure that all scientific testimony is both reliable and relevant." Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 757 (8th Cir.2006) (citing Daubert, 509 U.S. at 580, 113 S.Ct. 2786; Fed.R.Evid. 702). "This `gatekeeping requirement' is to ensure that the proffered expert exercises the same `intellectual rigor' in the courtroom as does an expert in the relevant field." Bland v. Verizon Wireless, L.L.C., 538 F.3d 893, 896 (8th Cir.2008) (quoting Ahlberg v. Chrysler Corp., 481 F.3d 630, 635 (8th Cir.2007)).
In Lauzon v. Senco Prods., Inc., the Eighth Circuit Court of Appeals articulated a three-part test for district courts to apply when screening testimony under Rule 702.
First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.
270 F.3d 681, 686 (8th Cir.2001) (internal citations and quotations omitted). To satisfy the relevancy requirement, expert testimony must "provide[ ] information beyond the common knowledge of the trier of fact." Kudabeck v. Kroger Co., 338 F.3d 856, 860 (8th Cir.2003) (citing Daubert, 509 U.S. at 591, 113 S.Ct. 2786). "To satisfy the reliability requirement, the proponent of the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." Marmo, 457 F.3d at 757-58 (citing Daubert, 509 U.S. at 589-90, 113 S.Ct. 2786). A non-exhaustive list of the factors a court considers in a Daubert analysis are:
(1) whether the expert's methodology has been tested;
(2) whether the technique has been subjected to peer review and publication;
(3) whether the technique has a known or knowable rate of error; and
(4) whether the technique has been generally accepted in the proper scientific community.
Lauzon, 270 F.3d at 686-87 (internal citation and quotation omitted). Additional factors that can be considered by a district court are: "whether the expertise was developed for litigation or flowed naturally from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed evidence sufficiently connected the proposed testimony with the facts of the case." Lauzon, 270 F.3d at 686-87 (citations omitted).

IV. ANALYSIS
Parties' Contentions. Dow AgroSciences and Terminix do not challenge the admissibility of Dr. Fenske's testimony under the first two steps of the Daubert analysis laid out in Sappingtonrelevancy or Dr. Fenske's qualifications. However, Dow AgroSciences and Terminix contest the third stepthe reliability and trustworthiness of Dr. Fenske's testimony. Dow AgroSciences and Terminix contend Dr. Fenske failed to utilize a reliable methodology and characterize his opinions regarding exposure and dosage as "musings." Dow AgroSciences and Terminix attack the factual basis of Dr. Fenske's comparisons of the Junks' exposure and the exposures in the studies. Dow Agro-Sciences and Terminix emphasize that Dr. Fenske was unable to estimate or calculate the exposure levels or dosage of chlorpyrifos for Rene and Tyler Junk. When asked at his deposition if he could estimate or calculate the exposure or dosage of Rene Junk, Dr. Fenske gave the following responses:
Q. With respect to Mrs. Junk's exposure to chlorpyrifos, did you estimate or calculate her exposure levels to chlorpyrifos after each application?
A. To calculate exposure levelsa calculation of an exposure level would be basedneeds to be based on measurements, and there were no measurements available.
Q. So with respect to Mrs. Junk, you didn't estimate or calculate an inhalation level, a dermal level or an ingestion level of chlorpyrifos?
A. It wasn't possible to do that without data available.
[Dr. Fenske Depo., p. 106]. Dr. Fenske similarly testified that he did not have the necessary data to estimate or calculate Tyler Junk's exposure to chlorpyrifos.
Q. With respect to Tyler Junk, did you estimate any kind of exposure level or absorbed dose in utero to chlorpyrifos?
A. Iagain, without knowing the exposure of Mrs. Junk, it's not possible to estimate exposure to Tyler in utero.
Q. Okay. Did you review any literature relating to the blood-brain barrier in utero?
A. I did not review that type of information.
Q. Okay. With respect to the applications made after Tyler was born, did you estimate or calculate the exposure level or dose, via inhalation, dermal or ingestion, to Tyler?
A. I did not know the air concentrations in the home. I did not know Tyler's behavior or his location in the home at any particular time. And I didn't know whether or not he engaged in hand-to-mouth activity. So I did not have the information to base an exposure estimate.
Q. Okay. So you didn't calculate the doseinhalation dose, dermal dose or ingestion dose for Tyler?
A. I didn't have the information to calculate those numbers.
[Dr. Fenske Depo., pp. 106-07].
Junk argues that Dr. Fenske used "reliable methods" to opine that Rene and Tyler Junk were exposed to levels of chlorpyrifos capable of causing neurologic harm to Tyler. Junk argues that Dow AgroSciences' and Terminix's attacks on the factual basis of Dr. Fenske's opinion go to the credibility of Dr. Fenske's testimony, not the admissibility. Junk argues that Dr. Fenske need not produce exact exposure levels or dosage; she contends that Dr. Fenske's conclusion that Rene and Tyler Junk's exposure to chlorpyrifos exceeded safe levels is sufficient.
Dr. Fenske's Opinions. In his declaration, Dr. Fenske opined that, "Mrs. Rene Junk was almost certainly exposed during her pregnancy to levels of chlorpyrifos sufficiently high to produce neurologic deficits in the child that she carried." [Dr. Fenske First Decl. ¶ 5(f)]. Dr. Fenske based his opinion regarding Rene Junk's exposure on the 2002 and 2003 Whyatt studies and the 2006 Rauh study.[2] [Dr. Fenske First Decl. ¶ 16(a)-(c)]. Dr. Fenske explained his basis for his exposure opinion in his revised report:
6. Exposure of Mrs. Junk
Only one epidemiologic study, by Columbia University researchers, has examined indoor residential chlorpyrifos exposures among women during pregnancy. In this study investigators found that women who lived in residences in which Dursban (chlorpyrifos) had been applied as a crack-and-crevice treatment had average daily exposures of approximately 20 nanograms chlorpyrifos per cubic meter of air (Whyatt et al., 2002; 2003). These chlorpyrifos air concentrations were correlated with chlorpyrifos concentrations in umbilical cord blood (Whyatt et al. 2004). Given these exposures, it was found that the more highly exposed children in this cohort scored more poorly on several neurodevelopmental tests than did children without such exposures (Rauh 2006). Thus, there appears to be persuasive evidence from the only epidemiologic study available that children exposed to chlorpyrifos in utero or early in life have measurable neurologic deficits compared to unexposed children. No measurement of air concentrations or umbilical cord concentrations of chlorpyrifos were performed for Mrs. Junk, but it is reasonable to conclude that her exposures were comparable to those of the women in the Columbia University study, since in each case the residences were treated in a similar manner and with the same product.
[Dr. Fenske Revised Report, ¶ 6].
In his declaration, Dr. Fenske also opined that "Tyler Junk was almost certainly exposed to levels of chlorpyrifos during early childhood that exceeded the U.S. Environmental Protection Agency's current regulatory concern levels." [Dr. Fenske First Decl., ¶ 5(g)]. Dr. Fenske relied on the 1998 Byrne study as a basis for his opinion regarding Tyler Junk's exposure.[3] [Dr. Fenske First Decl. ¶ 17(a)]. Dr. Fenske explained his reliance on the Byrne study in his revised report:
7. Exposure of Tyler Junk
Despite public health concerns regarding the indoor use of chlorpyrifos throughout the late 1980's and early 1990's, the Dow Chemical Company's first study of crack-and-crevice/baseboard residential treatment with Dursban L.O. was published in 1998 (Byrne et al. 1998). In this study, it was estimated that 3.3 to 3.0 grams of chlorpyrifos were applied to three homes. The Byrne study indicated an average absorbed dose for small children in these residences of 1.05 micrograms chlorpyrifos per kilogram of body weight. This dose is more than twice the U.S. EPA's level of concern for children's acute exposures, and more than 35 times the U.S. EPA's level of concern for children's chronic exposures.
The initial treatment of the Junk residence in March 1992 (and presumably all subsequent treatments) delivered approximately 4.7 grams of chlorpyrifos into the home. Thus, it would be expected that Tyler Junk's exposure was higher than those estimated by the Byrne analysis, and thus exceeded the U.S. EPA's level of concern substantially.
[Dr. Fenske Revised Report, ¶ 7].
Dr. Fenske's Methodology. Dr. Fenske first established a threshold dosage of chlorpyrifos. Dr. Fenske used the EPA's reference doses for children and pregnant women of 0.5 micrograms per kilogram of body weight per day (ug/kg-day) for acute exposures and 0.03 ug/kg-day for chronic exposures. To determine whether Rene and Tyler Junk's dosage exceeded the threshold, Dr. Fenske "compared the Junk exposure information to exposure data in comparable circumstances."
To determine Rene Junk's exposure and dosage, Dr. Fenske compared the circumstances of her exposure with the circumstances of participants' exposure in the Whyatt and Rauh studies. Dr. Fenske stated that chlorpyrifos was applied to the interior of the Junk home and the homes in the study via crack-and-crevice applications. [Dr. Fenske Revised Report, ¶ 6]. Dr. Fenske concluded that Rene Junk's average daily exposure to chlorpyrifos was "comparable" to 20 nanograms per cubic meter of air. [Dr. Fenske Revised Report, ¶ 6]. That figure comes from the 2002 Whyatt study, in which scientists determined 20 nanograms per cubic meter of air was the participants' average daily exposure to chlorpyrifos. [Dr. Fenske Revised Report, ¶ 6]. Dr. Fenske provided two bases for his comparison: 1) the residences in the 2002 Whyatt study and the Junk residence were treated in a similar manner, and 2) the residences in the 2002 Whyatt study and the Junk residence were treated with the same product. [Dr. Fenske Revised Report, ¶ 6].
Next, Dr. Fenske stated that air concentrations of chlorpyrifos were correlated with concentrations of chlorpyrifos in the umbilical cord blood of women in the 2003 Whyatt study. [Dr. Fenske Revised Report, ¶ 6]. Dr. Fenske stated that in the 2006 Rauh study "more highly exposed children in this cohort scored more poorly on several neurodevelopmental tests than did children without such exposures." [Dr. Fenske Revised Report, ¶ 6]. Thus, Dr. Fenske concluded that Rene Junk's exposure to chlorpyrifos was "sufficiently high to produce neurologic deficits in the child that she carried." [Dr. Fenske Decl. ¶ 5].
To estimate Tyler Junk's exposure and dosage, Dr. Fenske compared the circumstances of his exposure with the circumstances of exposure in the 1998 Byrne study. In the Byrne study, scientists estimated the absorbed doses of chlorpyrifos for children residing in three houses that underwent crack-and-crevice treatments. Dr. Fenske stated that between 3.3 and 3.9 grams of chlorpyrifos were applied to the homes in the Byrne study, whereas 4.7 grams of chlorpyrifos were applied to the Junk home. [Dr. Fenske Revised Report, ¶ 7]. In the Byrne study, the estimated absorbed dose of chlorpyrifos for a child was 1.05 ug/kg-day. [Dr. Fenske Revised Report, ¶ 7]. Dr. Fenske stated that this dose is more than twice the reference dose for acute exposures and more than 35 times the dose for chronic exposures. [Dr. Fenske Revised Report, ¶ 7]. Dr. Fenske reasoned that Tyler Junk's dosage to chlorpyrifos must have exceeded the current reference dose established by the EPA because 1) the Junk home was treated with more chlorpyrifos than the three homes in the study, and 2) the average estimated dosage for the children in the study exceeded the current reference dose established by the EPA. [Dr. Fenske Revised Report, ¶ 7].
Dr. Fenske's Methodology and Daubert. In determining whether expert testimony should be admitted, the requirements of Daubert and its progeny direct district courts to concentrate on the second tenet listed in Rule 702the principles and methods utilized by the expert. "The focus, of course, must solely be on principles and methodology, not on conclusions they generate." Bonner, 259 F.3d at 929 (quoting Daubert, 509 U.S. at 594-95, 113 S.Ct. 2786). "A trial judge must make a preliminary assessment of whether the proffered expert's methodology is both scientifically valid and acceptable to the case." Bland, 538 F.3d at 896 (quoting Ahlberg, 481 F.3d at 635 (internal quotation omitted)). "An expert opinion must be supported by appropriate validation i.e., good grounds based on what is known." Glastetter v. Novartis Pharm. Corp., 252 F.3d 986, 988-89 (8th Cir.2001) (quoting Daubert, 509 U.S. at 590, 113 S.Ct. 2786) (internal quotation marks omitted). "[T]he plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirement." Dodge v. Cotter Corp., 328 F.3d 1212, 1222 (10th Cir.2003) (citing Mitchell v. Gencorp Inc., 165 F.3d 778, 781 (10th Cir.1999)).
Junk failed to prove by the preponderance of the evidence that the methodology employed by Dr. Fenske is a "scientifically valid" way to determine if Rene and Tyler Junk were exposed to unsafe levels of chlorpyrifos. While Dr. Fenske typically uses deterministic modeling to estimate or calculate exposure levels in his research and teaching, he testified he did not do so with respect to Rene and Tyler Junk because he did not have the necessary data. [Dr. Fenske Depo., pp. 31, 33, 36-45]. Dr. Fenske testified that a lack of data prevented him from using other methods besides deterministic modeling, such as video imaging and simulated exposure using photography, to estimate or calculate Rene or Tyler Junk's exposure. [Dr. Fenske Depo., pp. 43, 44]. As a result, Dr. Fenske was unable to estimate or calculate the exposure levels for Rene or Tyler Junk as he has done for past exposure cases in his published articles and other research.
Instead of using a deterministic model, Dr. Fenske compared the circumstances of the Junks' exposure with the circumstances of participants' exposure in the Whyatt, Rauh, and Byrne studies to determine if the Junks' exposure levels exceeded the reference dose. Besides the personal assurances of Dr. Fenske, Junk provided no evidence to demonstrate that Dr. Fenske's methodology is reliable.[4] Junk provided no evidence that Dr. Fenske's methodology has been tested, subjected to peer review or publication, has known or knowable rate of error, or is generally accepted in the scientific community. In formulating his opinions with respect to Rene and Tyler Junk's exposure, Dr. Fenske did not employ the same "intellectual rigor that characterizes the practice of an expert in the relevant field." Marmo, 457 F.3d at 757.
The first step in Dr. Fenske's methodology was to determine a level of exposure "known to cause the type of injuries [Tyler Junk] suffered." Mattis v. Carlon Elec. Prods., 295 F.3d 856, 860-61 (8th Cir.2002) (citation omitted). Dr. Fenske utilized the EPA's current reference dose of chlorpyrifos for children and pregnant women. As this Court has previously stated, government agency regulatory standards are irrelevant to Junk's burden of proof in a toxic tort cause of action because of the agency's "preventative perspective[.]" [Dkt. 253, p. 10 quoting Glastetter, 252 F.3d at 991]. "[A government agency's] approach differs from [the Court's] in [a] critical aspect. [A government agency] will remove [products] from the marketplace upon a lesser showing of harm to the public than the preponderance-of-the-evidence or more-likely-than-not standards used to assess tort liability." [Dkt. 253, p. 10 quoting Glastetter, 252 F.3d at 991]. Dow AgroSciences' proposed expert, Dr. Christopher J. Bogert, Ph.D., stated that the EPA does not endorse Dr. Fenske's conclusion that doses of chlorpyrifos above the reference dose will result in adverse effects.
The [reference dose] is useful as a reference point from which to gauge the potential effects of the chemical at other doses. Usually, doses less than the [reference dose] are not likely to be associated with adverse health risks, and are therefore less likely to be of regulatory concern. As the frequency and/or magnitude of the exposure exceeding the [reference dose] increase, the probability of adverse effects in a human population increases. However, it should not be categorically concluded that all doses below the [reference dose] are "acceptable" (or will be risk-free) and that all doses in excess of the [reference dose] are "unacceptable" (or will result in adverse effects).
[Second Supplemental Report of Dr. Bogert (citing EPA. Section 1.3.2.3. in Reference Dose (RfD): Description and Use in Health Risk Assessments, Background Document 1A. March 15, 1993.), Dkt. 331, Dow AgroSciences' App., p. 455]. Dr. Fenske's use of the EPA's reference dose is not a reliable threshold by which to determine if the Junks' exposure reached a level "known to cause the type of injuries [Tyler Junk] suffered." Mattis, 295 F.3d at 860-61 (citation omitted).
In order to satisfy the requirements of Daubert, Dr. Fenske must use a "scientifically valid" methodology to conclude that the Junks' exposure "exceeded safe levels." Bonner, 259 F.3d at 931 (citation omitted). Dr. Fenske testified that he lacked the necessary data in this case to use the methodology he typically employs in his research and his teaching. As a result, he was left to compare the Junks' exposures with exposures that occurred in academic studies. Junk failed to provide sufficient evidence to demonstrate Dr. Fenske's comparisons are a "scientifically valid" methodology. In addition, the EPA reference dose is not a reliable threshold to determine level of exposure in the context of a toxic tort case. For these reasons, the Court finds that Dr. Fenske's methodology is not "scientifically valid" as required by Daubert.
Factual Basis for Dr. Fenske's Opinion. Junk correctly asserts that the factual basis of an expert opinion generally goes to the credibility of testimony, not its admissibility. See Marvin Lumber and Cedar Co. v. PPG Indus., Inc., 401 F.3d 901, 916 (8th Cir.2005). However, the facts underlying an expert's opinion are a part of the Daubert analysis. "Expert testimony should not be admitted when it is speculative, it is not supported by sufficient facts, or the facts of the case contradict or otherwise render the opinion unreasonable." U.S. v. Rushing, 388 F.3d 1153, 1156 (8th Cir.2004) (citing Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1056-57 (8th Cir.2000)). "To be reliable under Daubert, an expert's scientific testimony must be based on scientific knowledge, which `implies good grounding in the methods and procedures of science' based on actual knowledge, not `subjective belief or unsupported speculation.'" Dodge, 328 F.3d at 1222 (10th Cir.2003) (quoting Daubert, 509 U.S. at 590, 113 S.Ct. 2786). Junk characterizes Dow AgroSciences' and Terminix's attacks on Dr. Fenske's correlation between the exposure circumstances of Rene and Tyler Junk and the study participants as questions of credibility, not admissibility. The Court finds, however, that Dr. Fenske's correlation and his resulting opinions are not supported by sufficient facts to meet the requirements of Daubert.
To support his opinion that Rene Junk's average daily exposure to chlorpyrifos was "comparable" to 20 nanograms per cubic foot of air, Dr. Fenske stated that crackand-crevice treatment was the method of application in both the residences in the 2002 Whyatt study and the Junk residence. However, the 2002 Whyatt study does not contain any information indicating that pesticides were applied to the residences via crack-and-crevice treatment. Crack-and-crevice treatments were not one of the eight specific types of methods accounted for in the 2002 Whyatt study. In fact, the term "crack-and-crevice treatment" appears nowhere in the article. The questionnaire used in the study included an inquiry into whether an exterminator applied pesticides in the home, but did not require the participants to identify the specific type of method used by the exterminator. Dr. Fenske addresses this criticism by stating:
It is unlikely the product would have been applied by dust application or wettable powder because those were not common applications of the product but, if the product were applied that way in the Whyatt study, my analysis of exposure would not change because those methods would not alter the effect of introducing chlorpyrifos into the home environments.
[Dr. Fenske Second Decl., ¶ 9]. Dr. Fenske admits that he is unsure of the method by which chlorpyrifos was applied to the homes of the study participants. Dr. Fenske testified that the method of application affects the amount of chlorpyrifos delivered into a treated area. [Dr. Fenske Depo., p. 69]. Dr. Fenske stated in his reports and declarations that the fact that Rene Junk's home and the homes in the study were treated in a "similar manner" was one of the two commonalities he used to compare Rene Junk's exposure level with the study participants' exposure level. Without that, the only commonality shared by Rene Junk and the study participants is the fact that their homes were treated with chlorpyrifos. The Court finds that Dr. Fenske did not have sufficient facts to reliably "compar[e] the Junk exposure information to exposure data in [Whyatt]" and determine Rene Junk's exposure and dosage was sufficient to cause Tyler's injuries.
Dr. Fenske used the 1998 Byrne study as a basis to conclude that Tyler Junk was exposed to a level of chlorpyrifos that exceeds the current EPA reference dose for pregnant women and children. Dr. Fenske relied on a single variable, the amounts of chlorpyrifos applied to the Junk home and the Byrne study homes, for his conclusion that Tyler Junk must have absorbed a higher dose of chlorpyrifos than the estimated absorbed doses for children in the Byrne study. Dr. Fenske reasoned that Tyler Junk's absorbed dosage would likely be higher than the average absorbed dose in the Byrne study because approximately 4.7 grams of chlorpyrifos was applied in the Junk home whereas 3.3 to 3.9 grams of chlorpyrifos was applied to the three homes in the Byrne study. However, the only evidence on this issue shows that some of the liquid spray was applied to the exterior of the Junk home and in the attic crawl space, thereby eroding Dr. Fenske's assertion that 4.7 grams of chlorpyrifos was applied to the interior of the Junk home. In response, Dr. Fenske stated:
My analysis assumed that Dursban L.O. was applied indoors and the granular Dursban L.O. was applied outdoors. Based on the testimony in the case, my assumption is reliable ... This is enough information to conclude that the amount of chlorpyrifos delivered into the environment of the Junk home exceeded the levels at issue in the Byrne study and was comparable to the levels in the Whyatt study.
The amounts of chlorpyrifos applied to the Junk home and the homes in the Byrne study is the only variable Dr. Fenske relied on in correlating Tyler Junk's dosage with the estimated absorbed dosage for children in the study. Yet, Dr. Fenske admits his assertion that 4.7 grams was applied to the interior of the Junk home during each application is an assumption. Dr. Fenske's basis for correlating Tyler Junk's dosage with the results of the Byrne study does not constitute "scientific knowledge, which implies `good grounding in the methods and procedures of science' based on actual knowledge." Dodge, 328 F.3d at 1222.
Daubert nor the Federal Rules of Evidence "require a district court to admit opinion evidence that is connected to existing data only the ipse dixit of the expert. A court may conclude there is simply too great of an analytical gap between the data and the opinion proffered." Menz v. New Holland North America, Inc., 507 F.3d 1107, 1115 (8th Cir.2007) (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). Dr. Fenske lacked necessary data to reliably compare Rene and Tyler Junk's exposure circumstances with the exposure circumstance of the study participants in the Whyatt, Rauh, and Byrne studies. The Court finds that there is "simply too great of an analytical gap" between the data Dr. Fenske relied on and his proffered opinions. For that reason and others stated above, the Court finds that Dr. Fenske's methodology does not meet the requirements of Daubert, and his opinions regarding the exposure and dosage of Rene and Tyler Junk are inadmissible pursuant to Rule 702.

A. Reexamination of Admissibility of Dr. Bearer's Causation Opinion
As stated above, Dr. Bearer relied on the exposure analysis of Dr. Fenske to conclude that Tyler Junk was exposed to a quantity of chlorpyrifos that exceeded safe levels. [Dr. Bearer Depo., pp. 58-60; Dr. Bearer Decl., ¶ 16]. Dr. Bearer used Dr. Fenske's opinion to "rule in" exposure to chlorpyrifos as a plausible cause of Tyler Junk's injuries in her differential diagnosis. The Court admitted Dr. Bearer's causation opinion with the caveat that it would be reexamined when the admissibility of Dr. Fenske's expert testimony had been determined.
"Because a differential diagnosis is presumptively admissible a district court may exercise its gatekeeping function to exclude only those diagnoses that are scientifically invalid." Glastetter, 252 F.3d at 989 (citing Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1208 (8th Cir.2000)). "A `differential diagnosis [is] a technique that identifies the cause of a medical condition by eliminating the likely causes until the most probable cause is isolated.'" Bland, 538 F.3d at 897 (quoting Turner, 229 F.3d at 1208). "In performing a differential diagnosis, a physician begins by `ruling in' all scientifically plausible causes of the plaintiffs injury. The physician then `rules out' the least plausible causes of injury until the most likely cause remains." Kudabeck, 338 F.3d at 860-61 (quoting Glastetter, 252 F.3d at 989). "The final result of a differential diagnosis is the expert's conclusion that a defendant's product caused (or did not cause) the plaintiffs injury." Glastetter, 252 F.3d at 989 (citation omitted). "Under Daubert, expert opinions employing a differential diagnosis must be based on scientifically valid decisions as to which potential causes should be `ruled in' and `ruled out.'" Ervin v. Johnson & Johnson, Inc., 492 F.3d 901, 904 (7th Cir.2007) (citation omitted).
Without Dr. Fenske's exposure analysis, Dr. Bearer has no "scientifically valid" basis to "rule in" chlorpyrifos exposure as a plausible cause of Tyler Junk's injuries in her differential diagnosis. Dr. Bearer testified that she is not an expert in exposure assessment. [Dr. Bearer Depo., p. 168]. She testified that in her clinical practice, she relies on other experts to analyze exposure. [Dr. Bearer Depo., pp. 16, 104-05]. Dr. Bearer testified that she did not have knowledge of the quantity of chlorpyrifos applied to the Junk home, nor the method of application. [Dr. Bearer Depo., p. 121]. She testified that in forming her opinion regarding the causation of Tyler Junk's injuries, she "assumed" that Tyler Junk's in utero and postnatal exposure to chlorpyrifos was significant. [Dr. Bearer Depo., pp. 60-61, 121]. In sum, Dr. Bearer did not have sufficient scientific knowledge to support her "assumption" that Tyler Junk was exposed to unsafe levels of chlorpyrifos before and after birth.
"Ruling in" all plausible causes of injury is the first step of a differential diagnosis. See Kudabeck, 338 F.3d at 860-61 (quoting Glastetter, 252 F.3d at 989). Daubert requires that each step of an expert's analysis be supported by good grounds. See Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 267 (2nd Cir.2002) (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 745 (3d Cir.1994)). Without Dr. Fenske's exposure analysis, Dr. Bearer has no "scientifically valid" basis to "rule in" chlorpyrifos exposure as a plausible cause of Tyler Junk's injuries. "[A]ny step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible.'" Amorgianos, 303 F.3d at 267 (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d at 745) (emphasis removed). Because Dr. Bearer's "ruling in" of chlorpyrifos exposure lacks a "scientifically valid" basis, Dr. Bearer's differential diagnosis fails to meet the requirements under Daubert. As a result, her specific causation opinion is inadmissible pursuant to Rule 702.

V. CONCLUSION
The Court recognizes that "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." Lauzon, 270 F.3d at 686. A district court should exclude an expert's opinion "only if it is so fundamentally unsupported that it can offer no assistance to the jury." Polski v. Quigley Corp., 538 F.3d 836, 839 (8th Cir.2008) (internal citation omitted). "[T]he court must recognize that due to the difficulty of evaluating their testimony, expert witnesses have the potential to "be both powerful and quite misleading." And, given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir.1999).
Exclusion of Dr. Fenske's opinions regarding the exposure and dosage of Rene and Tyler Junk is warranted because the underlying methodology is not reliable and the opinion is not supported by sufficient facts and scientific knowledge. Similarly, Dr. Bearer lacks a scientifically valid basis to "rule in" chlorpyrifos exposure as a plausible cause of Tyler Junk's injuries. If placed before a jury, the opinions of Drs. Fenske and Bearer would mislead rather than assist the jury in reaching a determination. For that reason, Dow AgroSciences' Motion in Limine to exclude the opinions of Dr. Fenske and Dr. Bearer's specific causation opinions derived from Dr. Fenske's report [Dkt. 331] is granted.
Upon the foregoing,
IT IS ORDERED that Dow AgroScience's and Terminix's October 8, 2008, Motion in Limine to exclude the opinions of Dr. Richard Fenske is granted. The motion is further granted as to those portions of Dr. Bearer's testimony that rely on the opinions of Dr. Fenske.
NOTES
[1] The Factual Background is based on the facts as alleged in the June 12, 2007, report of Dr. Mohamed Abou-Donia, Ph.D.
[2] The Whyatt and Rauh studies were conducted by Columbia University. The Whyatt and Rauh studies are based on data collected from a cohort study of inner-city mothers and their newborn infants who were born between February 1998 and May 2002.

Rauh VA, Garfinkel R, Perera FP, Andrews HF, Hoepner L, Barr DB, Whitehead R, Tang D, Whyatt RW. Impact of prenatal chlorpyrifos exposure on neurodevelopment in the first 3 years of life among inner-city children. Pediatrics. 2006 Dec.; 118(6):e1845-59. Epub 2006 Nov. 20.
Whyatt RM, Carmann DE, Kinney PL, Reyes A, Ramirez J, Dietrich J, Diaz D, Holmes D, Perera FP. Residential pesticide use during pregnancy among a cohort of urban minority women. Environ Health Perspect. 2002 May; 110(5):507-14.
Whyatt RM, Barr DB, Carmann DE, Kinney PL, Barr JR, Andrews HF, Hoepner LA, Garfinkel R, Hazi Y, Reyes A, Ramirez J, Cosme Y, Perera FP. Contemporary-use pesticides in personal air samples during pregnancy and blood samples at delivery among urban minority mothers and newborns. Environ Health Perspect. 2003 May; 111(5):749-56.
[3] Byrne SL, Shurdut BA, Saunders DG. Potential chlorpyrifos exposure to residents following standard crack and crevice treatment. Environ Health Perspect. 1998 Dec; 106(12):A583-4.
[4] Junk argued in her brief, "In this case, Fenske used scientific methods he deemed valid and reliable, and did not use speculative, unsound methods." In his second declaration, Dr. Fenske stated, "My opinions in this case are based on the same intellectual and scientific rigor I use in all my professional pursuits. I would not have opined that Tyler and Rene Junk were exposed to chlorpyrifos at a level potentially harmful to humans unless I believed that the basis for the opinion was grounded in valid study results (Byrne, Whyatt, Rauh), factual support for my assumptions, and sound analysis." Dr. Fenske's assurances are not sufficient to meet the reliability requirement under Daubert. "The trial court's gatekeeping function requires more than simply `taking the expert's word for it.'" U.S. v. Frazier, 387 F.3d 1244, 1261 (11th Cir.2004) (internal citation omitted).