# IN THE COURT OF APPEALS OF IOWA

No. 21-0723
Filed June 15, 2022

**JACQUELINE SUE UHLER,**
 Plaintiff-Appellant,

**vs.**

**THE GRAHAM GROUP, INC.,**
 Defendant-Appellee.

_____

 Appeal from the Iowa District Court for Polk County, Samantha Gronewald,

Judge.

 Jacqueline Uhler appeals the grant of summary judgment in favor of The

Graham Group, Inc. **AFFIRMED.**

 Jason D. Walke of Walke Law, LLC, West Des Moines, for appellant.

 James S. Blackburn of Finley Law Firm, P.C., Des Moines, for appellee.

 Heard by Tabor, P.J., and Greer and Ahlers, JJ.

**AHLERS, Judge.**

Jacqueline Uhler appeals from the grant of summary judgment dismissing her personal-injury claim against The Graham Group, Inc. (Graham). Uhler argues the district court erred in finding she failed to generate a fact question on whether Graham's use of a chemical in Uhler's office building resulted in permanent damage to her lungs and other injuries. We agree that Uhler's failure to produce expert testimony or other evidence resulted in a failure to generate a fact question as to whether Graham's use of the chemical was the proximate cause of Uhler's injuries. Therefore, we affirm.

**I.      Background Facts and Proceedings**

On October 16, 2017, Uhler was working in an office building in Des Moines. The building has five floors, including a lower level, and is approximately 90,000 square feet. Graham was responsible for the operation and maintenance of the building. That afternoon, a maintenance worker for Graham received a call about a clogged sink in a bathroom on the lower level of the building, one floor below the first level. The worker poured "about a cup" of Draynamite, a chemical drain cleaner, into the clogged sink. The worker noted the Draynamite smelled like rotten eggs. The worker stayed in the bathroom for a "couple minutes" to observe the sink, left the bathroom, and returned about ten minutes later to find the drain appeared to be clear and in good working order. The maintenance manager soon received a call from a second-floor office about a "funny odor" in the area. The manager went to the lower-level bathroom to inspect the drain and noticed a rotten egg smell right outside the bathroom. In response to the odor, the manager and the worker opened doors in the building and on the roof to draw air up and out of

the building, and the manager altered the building's ventilation settings to draw fresh air into the building.

At some point during that afternoon, Uhler noticed a harsh, chemical smell like rotten eggs in her third-floor cubicle. Uhler developed a headache, sore throat, burning in her eyes and nose, and difficulty breathing. Uhler left the office early due to her symptoms. Uhler noticed the same odor in other areas as she left the building, but the odor disappeared as soon as she was outside. At least eleven people working in the building that day, including Uhler, filed incident reports with their employers complaining of the odor and reporting symptoms such as headache, nausea, and difficulty breathing. Despite the odor, only a few left the building for the day. The safety data sheet for Draynamite cautions against exposure to Draynamite:

> Risk of serious damage to the lungs (by inhalation). Causes burns to the respiratory tract, nose, mouth, and throat with discomfort, nasal discharge, sneezing, coughing, rapid heartbeat, and chest pain. Inhalation of mist or vapors may cause chemical pneumonia which can cause damage and may be fatal.

In October 2019, Uhler filed her petition alleging Graham's negligence was "the direct and proximate cause of the chemical accident" (in other words, the use of Draynamite) that caused her to seek medical treatment and sustain permanent damage to her lungs and acute injuries. Uhler designated a series of experts, including Drs. Jacqueline Stoken and Daniel Dodge. Dr. Stoken provided a report, after examining Uhler in February 2021 and reviewing her medical records, in which she concluded, "Uhler has sustained a chemical fume injury with Draynamite which has caused permanent lung damage. This has resulted in a material aggravation of her underlying asthma and permanent lung damage." Similarly, Dr.

Dodge provided an affidavit, after examining Uhler and reviewing her medical records, in which he agreed with the statement, "Uhler, as a result of her exposure to fumes in her place of employment on October 16, 2017, suffered a significant and permanent worsening of her pre-existing asthma." Graham moved for summary judgment, which the district court granted, finding Uhler failed to provide expert opinion establishing causation. Uhler appeals.

## II. Standard of Review

We review a grant of summary judgment for correction of errors at law. *Ranes v. Adams Lab'ys, Inc.*, 778 N.W.2d 677, 685 (Iowa 2010). "Summary judgment is appropriate only when the record shows no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Hedlund v. State*, 930 N.W.2d 707, 715 (Iowa 2019). "We view the summary judgment record in a light most favorable to the nonmoving party." *Id*. "Summary judgment is proper when the plaintiff's claim lacks evidence to support a jury question on an essential element of the claim." *Ranes*, 778 N.W.2d at 685.

## III. Analysis

Causation is an essential element of a negligence claim. *Garr v. City of Ottumwa*, 846 N.W.2d 865, 869 (Iowa 2014). "Causation is ordinarily a jury question." *Id.* at 870. "In some cases, however, causation may be decided as a matter of law." *Id.* "[W]hen the connection between the defendant's negligence and the plaintiff's harm is not within the layperson's common knowledge and experience, 'the plaintiff needs expert testimony to create a jury question on causation.'" *Id.* at 872 (quoting *Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 793 (Iowa 2009)).

The central dispute in this case is whether Graham's use of Draynamite caused Uhler's injuries. The district court characterized Uhler's claim as a toxic tort claim. Generally, a plaintiff in a toxic tort case must establish both general and specific causation. *Ranes*, 778 N.W.2d at 687.[1] "General causation is a showing that the drug or chemical is capable of causing the type of harm from which the plaintiff suffers." *Id.* at 688. "Specific causation is evidence that the drug or chemical in fact caused the harm from which the plaintiff suffers." *Id.* "There must be evidence that would permit a reasonable person to conclude the [substance] probably caused the injury claimed." *Id.* Expert testimony is often necessary to establish causation in a toxic tort case. *Id.* at 688–89 ("In the toxic-tort case before us, . . . expert medical and toxicological testimony is unquestionably required to assist the jury."). The Eighth Circuit summarized the plaintiff's burden in establishing causation in a toxic tort case:

> Actions in tort for damages focus on the question of whether to transfer money from one individual to another, and under common-law principles . . . that transfer can take place only if one individual proves, among other things, that it is more likely than not that another individual has caused him or her harm. It is therefore not enough for a plaintiff to show that a certain chemical agent sometimes causes the kind of harm that he or she is complaining of. At a minimum, we think that there must be evidence from which the factfinder can conclude that the plaintiff was exposed to levels of that agent that are known to cause the kind of harm that the plaintiff claims to have suffered. We do not require a mathematically precise table equating levels of exposure with levels of harm, but there must be evidence from which a reasonable person could conclude that a defendant's emission has probably caused a particular plaintiff the kind of harm of which he or she complains before there can be a recovery.

---

[1] Uhler asserts *Ranes* has limited applicability to her case. She notes her claim of workplace exposure is factually different from the plaintiff in *Ranes* who claimed injuries from consuming pharmaceuticals. *See* 778 N.W.2d at 682–84. While Uhler's facts are undeniably different, the law of causation in toxic torts explained in *Ranes* applies to Uhler's toxic tort case.

*Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1107 (8th Cir. 1996) (internal citation omitted).

To establish general causation, Uhler must show the use of Draynamite, at the levels used by Graham, is capable of causing her injuries. *See Ranes*, 778 N.W.2d at 688. Uhler submitted the data sheet and other documentation showing inhalation of Draynamite can cause lung damage and other bodily injuries. Both parties agreed that Draynamite can cause lung damage at some level of exposure. This evidence might be sufficient to generate a fact question on general causation regarding Uhler's acute and permanent injuries if there was expert testimony Draynamite "is capable of causing injuries like that suffered by the plaintiff in human beings subjected to the same level of exposure as [Uhler]." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 928 (8th Cir. 2001). Because no expert identified at what levels or length of exposure Draynamite could cause an injury, the district court found Uhler failed to show general causation. To assure a complete analysis despite this finding, the district court turned to the specific causation proof. "Because proof of general causation cannot satisfy a plaintiff's burden without proof of specific causation, and proof of specific causation implicitly requires proof of general causation, the focus of inquiry in toxic tort cases typically is on the existence of specific causation." David E. Bernstein, *Getting to Causation in Toxic Tort Cases*, 74 Brook. L. Rev. 51, 52–53 (2008). At a minimum, both questions about causation come down to the question of dose. The dose-response relationship refers to an epidemiological principle "that exposure to a substance must exceed a certain level before it manifests a risk of adverse health effects." *In*

*re Prempro Prods. Liab. Litig.*, 738 F. Supp. 2d 887, 895 (E.D. Ark. 2010) (citing Fed. Jud. Ctr., Reference Manual on Scientific Evidence 475 (2d ed. 2000)). Likewise, proof of mere possibility of exposure to a chemical is not enough. *Spaur v. Owens-Corning Fiberglas Corp.*, 510 N.W.2d 854, 861–62 (Iowa 1994).

To establish specific causation, Uhler must show Graham's use of Draynamite actually caused her injuries. *See Ranes*, 778 N.W.2d at 688. The undisputed evidence shows Graham used Draynamite in the office building while Uhler was present. However, the fact that a dangerous chemical was used in Uhler's workplace is not enough by itself to establish specific causation. *See Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162–63 (4th Cir. 1986) (rejecting "a rule that if the plaintiff can present any evidence that a company's asbestos-containing product was at the workplace while the plaintiff was at the workplace, a jury question has been established as to whether that product contributed as a proximate cause to the plaintiff's disease"). To generate a fact question on specific causation, Uhler must produce evidence to allow a jury to find Graham's use of Draynamite in the lower-level bathroom caused Uhler in her third-floor cubicle to be exposed to unsafe levels of Draynamite known to cause the kind of injuries she now claims. *See Wright*, 91 F.3d at 1107.

Identifying how Draynamite moves through a building and causes injury is far beyond a layperson's understanding and requires expert testimony. *See id.* While Uhler need not need measure her chemical exposure with mathematical precision, *see id.*, she has not produced any evidence to show the amount of Draynamite used is capable of traversing great distances in an office building and causing permanent or acute injury. Dr. Stoken opined inhalation of even "small

amounts" of Draynamite may cause permanent injury.[2]  However, Dr. Stoken does not quantify a harmful level of Draynamite, and no expert even attempts to quantify any level of Uhler's Draynamite exposure.  Uhler's experts offered no insight into the principles and methodology supporting their conclusions.[3]  Thus, Uhler's experts do not support finding Graham's actions caused her to be exposed to levels of Draynamite sufficient to cause her injuries.[4]

---

[2]  *See* Bernstein, *Getting to Causation in Toxic Tort Cases*, 74 Brook. L. Rev. at 68 ("Still other experts decline to estimate the plaintiff's exposure.  They rely instead on terms such as "substantial," "significant," or "high"—terms that have no objective scientific meaning in the absence of a defined baseline.")

[3] *See Ranes*, 778 N.W.2d at 691 (noting the court's obligation to assess reliability of the expert opinion by examining the principles and methodology, rather than the conclusions the expert might offer).

[4] The dissent suggests that we have not adequately accounted for the supreme court's ruling in *Bloomquist v. Wapello County*, which noted that "while epidemiological evidence is helpful, it should not be held to be an absolute requirement in establishing causation."  500 N.W.2d 1, 5 (Iowa 1993).  We are mindful of *Bloomquist*, but we find it distinguishable on its facts.  In *Bloomquist*, five workers sued the county and others after they became ill after working in an old government building.  *Id.* at 2.  They claimed their illness was caused by pesticide sprayed in the building in an effort to combat a flea problem and by poor ventilation of sewer gas.  *Id.* at 2–3.  The pesticide was sprayed throughout the building on a monthly basis into "crack[s] and crevice[s]."  *Id.* at 2.  When that didn't work, the pesticide was "broadcast spray[ed]" in the building in addition to being sprayed in the cracks and crevices.  *Id*.  The pesticide was sprayed over the carpet while workers were still in the building, in violation of established standards of care; it was sprayed on the papers on workers' desks; and workers who were gone when the spraying occurred were allowed to return to the building while the carpet was still wet with pesticide.  *Id.*  As part of the evidence connecting the exposure to the pesticide with the claimed injury, Bloomquist had the benefit of tests done on the carpet several months after it was sprayed, which revealed remaining residue of the pesticide, even after the carpet was shampooed.  *Id.* at 3.  It was under these facts that the supreme court noted that epidemiological evidence is not "an absolute requirement in establishing causation."  *Id.* at 5.  Here, we have a much different situation with a one-time use of a small but unknown quantity of a chemical a long distance away from where Uhler is alleged to have ingested the fumes and been injured.  There was no repeat use, no prolonged or repeated exposure, and no violation of any established standards.  We do not read *Bloomquist* to say that requiring expert testimony to establish that a plaintiff has been exposed to levels sufficient to cause the claimed injuries is never required.

With Uhler's pre-existing history of asthma and lung issues, her proof to support a permanent injury suffers from that found in *Bland v. Verizon Wireless, (VAW) L.L.C.*, 538 F.3d 893, 897 (8th Cir. 2008), in which expert testimony was excluded because the expert:

> (1) failed scientifically to eliminate other possible causes as part of her differential diagnosis; (2) did not know what amount of exposure to the diflu[o]roethane-containing Freon causes, or involves an appreciable risk of causing, asthma; (3) had no good grounds for determining whether Bland was exposed to a sufficient dose of difluoroethane-containing Freon to have caused her asthma, because [the expert] could not determine or estimate the amount of difluoroethane or Freon Bland was actually or probably exposed to when she smelled the water in her water bottle; (4) could not extrapolate from the existing data because the gap between the data identified and [the expert's] proffered opinion was simply too great an analytical gap to support admissibility; (5) did not offer as evidence any personal experience with treating other patients following a similar exposure to difluoroethane, Freon, or Freon with difluoroethane; and (6) reliance on temporal proximity, without more, is insufficient to establish causation.

(Cleaned up.) Thus, the requirement that some showing of exposure to dangerous levels of Draynamite that could cause Uhler's claimed injury is even more compelling. *See Bland*, 538 F.3d at 898 (noting a general causation expert must identify (1) what amount of exposure was capable of causing the alleged injury and (2) the amount to which the plaintiff was actually or probably exposed).

When taking the record in the light most favorable to Uhler, she also provided considerable temporal evidence of a connection between her acute injuries and Graham's use of Draynamite. Eleven employees, including Uhler, filed

---

The circumstances that exist here are sufficiently different from those presented in *Bloomquist* that we do not find *Bloomquist* controlling here, and Uhler's failure to present expert testimony to establish that she was exposed to levels of Draynamite sufficient to cause her injuries is fatal to her claim.

incident reports for the day in question complaining of fumes. These other employees reported a variety of symptoms, at least some of which are similar to Uhler's acute symptoms, including headache, nausea, shortness of breath, ringing in the ears, dizziness, difficultly remembering, congestion, fatigue, chest tightness, cough, and other flu-like symptoms. Even Uhler's supervisor, who did not file an incident report, testified she had a headache on the day in question. An area on the second floor, which was open to the public, closed that day due to the fumes. Graham's maintenance staff took unprecedented steps to ventilate the building that day and quickly clear the fumes. Uhler preserved the value of this temporal evidence by promptly seeking medical attention, including a doctor's appointment two days after exposure to the fumes. *See Bland*, 538 F.3d at 899 (finding the plaintiff could not produce temporal evidence to support causation after waiting five weeks to visit a doctor).

"Under some circumstances, a strong temporal connection is powerful evidence of causation." *Bonner*, 259 F.3d at 931. However, even with strong temporal evidence, Uhler must still "prove that she was exposed to a quantity of the toxin that 'exceeded safe levels.'" *Id.* (citation omitted). In *Bonner*, the court affirmed judgment in favor of the plaintiff on her toxic tort claim after she "presented witnesses who testified that her exposure to [the chemical] was of a duration and of a volume sufficient to support a conclusion that she inhaled and/or absorbed through her skin at least a quarter of a teaspoon of [the chemical] when she was sprayed with it." *Id.* A showing that others reacted to the odor of a chemical with a headache or dizziness is a far cry from confirming the chemical caused someone permanent lung damage. *See Ranes,* 778 N.W.2d at 693 (noting that generally a

bare analogy to case reports to the injuries alleged in a particular case is "unreliable"). Even considering Uhler's temporal evidence of Graham using Draynamite immediately before her injuries, Uhler failed to present the type of evidence admitted in *Bonner*, that Graham's use of Draynamite exposed her to an unsafe level of toxic chemical sufficient to cause her injuries. *See* 259 F.3d at 931. Therefore, we find Uhler failed to generate a fact question regarding the causation of her injuries immediately following Graham's use of Draynamite.

**IV.    Conclusion**

Uhler did not provide expert testimony or other evidence to generate a fact question on whether Graham's use of Draynamite caused her to be exposed to levels of toxins sufficient to cause her injuries. We affirm the grant of summary judgment in favor of Graham.

**AFFIRMED.**

Greer, J., concurs; Tabor, P.J., dissents.

**TABOR, Judge** (dissenting)

"We have long been committed to the principle that issues of proximate cause are only rarely decided as a matter of law." *Bloomquist v. Wapello Cnty.*, 500 N.W.2d 1, 5 (Iowa 1993). Because the majority wrongly abandons that commitment today by finding that Jacqueline Uhler needed more precise expert testimony to generate a jury question on causation, I respectfully dissent.

Here's what we know from the summary judgment record. An employee poured one to two cups of the drain opener Draynamite into a clogged sink in a lower level bathroom of the Methodist Medical Plaza, a building owned and managed by the Graham Group. Within an hour, tenants on the third and fourth floors complained about the smell of "rotten eggs" and reported that some occupants of the building were feeling sick. Building staff tried to "recirculate" the air. A pediatric pulmonary clinic on the third floor closed after one of its doctors expressed concerned that the exposure could "trigger some breathing issues." Indeed, Uhler and ten other people in the building that day reported illness, including difficulty breathing. Uhler went home sick.

Two days later Uhler saw her doctor, complaining of "inhalation exposure to hydrogen sulfide." The doctor's notes confirmed "mild inhalation exposure symptoms" and a history of asthma. Uhler returned to that doctor eight days later, complaining about shortness of breath. The doctor believed that the likelihood of Uhler's symptoms relating to the fume exposure was "low" but referred her to "pulmonary for further evaluation." Then, after an "acute worsening of her asthma" including continued shortness of breath, Uhler saw pulmonologist Gregory Hicklin

who noted that her lung condition had been stable until her exposure to fumes at work.

Uhler also was evaluated by Dr. Jacqueline Stoken, who was board certified in physical medicine and rehabilitation. Dr. Stoken believed that Uhler "sustained a chemical fume injury with Draynamite" which caused "a material aggravation of her underlying asthma and permanent lung damage." The doctor observed that before the accident Uhler was not on medication for her asthma, but after exposure she had "significant obstruction, symptoms of wheezing, cough and shortness of breath and markedly diminished exercise capacity." Dr. Stoken also stated that during her extensive work in pulmonary care, she had seen "injury from the inhalation of fumes (even in small amounts) from dangerous chemicals, including sulfuric acid."

Finally, as part of the summary judgment record, Uhler offered an affidavit from pulmonologist Daniel Dodge. Dr. Dodge agreed that Uhler's exposure to fumes generated by the use of Draynamite in her workplace led to a "significant and permanent worsening of her pre-existing asthma."

Applying *Ranes v. Adams Laboratories, Inc.*, 778 N.W.2d 677 (Iowa 2010) to these facts, the majority finds that Uhler generated a fact question on general causation (that Draynamite could cause the type of harm she suffered).[5] But not on specific causation (that the use of Draynamite by the Graham Group in fact caused the lung damage Uhler alleged). The majority is right that Uhler offered enough proof for a reasonable jury to find that inhaling Draynamite, in the abstract,

---

[5] By contrast, the district court determined that Uhler did not generate a jury question on general causation.

could cause lung damage. But the majority is mistaken in requiring more or different evidence to generate a jury question that the exposure to Draynamite was the cause of Uhler's lung damage.

In most tort cases the plaintiff can prove general and specific causation with the same evidence. *Ranes*, 778 N.W.2d at 688. For instance, "when a plaintiff is injured in an automobile accident . . . potential causal explanations other than the collision are easily ruled out [i.e., specific causation]; common experience reveals that the forces generated in a serious automobile collision are capable of causing a fracture [i.e., general causation]." *Id.* (quoting Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 28 cmt. c, at 405 (2010)). The bifurcated analysis adopted in *Ranes* is just a means to examine the connection between a toxic substance and the development of illness. *Id.* It does not add new elements to the tort. *Id.* Put another way, general causation involves "ruling in" a potential cause. *Id.* at 690. And specific causation involves both ruling in that potential cause and ruling out other possible causes. *Id.* at 695. If an expert cannot rule out other possible causes of an injury, or at least minimize the probability of their contribution, then a plaintiff may not meet the "more likely than not" threshold for proving causation.

The majority recognizes that the manufacturer's own safety data sheet "ruled in" the inhalation of Draynamite mist or vapors as a potential cause of serious damage to the lungs. Thus, a jury question exists on general causation.[6]

---

[6] This finding is telling. As a federal court recently noted,

> The requirement that a general causation expert identify the level of exposure differs from specific causation . . . . In order for a general causation expert to opine that a toxin is capable of causing injury in

So why not specific causation? In its analysis, the majority faults Uhler for not producing "any evidence to show the amount of Draynamite used is capable of traversing great distances in an office building and causing permanent or acute injury." But we know the fumes *did* traverse great distances—four floors of the medical building. The Graham Group admits as much in its response to Uhler's resistance to summary judgment. And we know that the fumes *did* cause acute injuries from the contemporaneous reporting of symptoms by Uhler and ten other building occupants. *See Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 931 (8th Cir. 2001) ("Under some circumstances, a strong temporal connection is powerful evidence of causation."); *see Cavallo v. Star Enter.*, 892 F. Supp. 756, 774 (E.D. Va. 1995), *aff'd in part, rev'd in part*, 100 F.3d 1150 (4th Cir. 1996) ("[I]f a known chemical is accidentally introduced into a company's ventilation system, and all of the workers exposed immediately develop the same adverse reaction, then the episode itself may be sufficiently indicative of causation.").

But when considering Uhler's allegation of permanent lung injury, the majority contends that she does not meet the standard set by the Eighth Circuit in *Bonner*. As the majority acknowledges, *Bonner* did not require experts to quantify the amount of chemical exposure to prove causation. *See* 259 F.3d at 931. Instead, *Bonner* held it was "sufficient for a plaintiff to prove that she was exposed

---

the general population, he or she must identify the level to which the plaintiff was exposed in order to evaluate whether that level is capable of causing harm. . . . Thus, an expert cannot opine as to general causation in a toxic tort case without information as to the relevant exposure and the standard by which to assess its harmfulness.

*Thiele v. DSM Food Specialties, USA, Inc.*, No. C18-4081-LTS, 2022 WL 94938, at *9 n.8 (N.D. Iowa Jan. 10, 2022) (citations omitted).

to a quantity of the toxin that 'exceeded safe levels.'" *Id.* (citation omitted). Assuming that federal standard applies here, Dr. Stoken's expert opinion supplied the proof that Uhler's exposure exceeded safe levels. She affirmed: "During the course of my career I have treated many patients who have experienced injuries and adverse effects from the inhalation of fumes from dangerous chemicals such as sulfuric acid (the active ingredient in Draynamite)." From that experience, Dr. Stoken discovered that inhalation of sulfuric acid fumes "even in small amounts" could cause pulmonary injuries. The expert's "personal experience with treating other patients following a similar exposure" buttressed her opinion on causation. *See Bland v. Verizon Wireless, (VAW) L.L.C.*, 538 F.3d 893, 898 (8th Cir. 2008).

Finally, the majority does not reckon with Iowa case law rejecting the necessity for epidemiological evidence. *See Bloomquist*, 500 N.W.2d at 3–6. To show pesticide sprayed on the carpet caused permanent neurological injuries to workers in the building, Bloomquist relied on "traditional cause-and-effect" testimony from treating doctors. *Id.* at 3. Building owners (the county) urged that Bloomquist could not meet his burden without statistics or scientific studies to prove a causal relationship between exposure to the flea spray and the incidence of disease. *Id.* at 4. The court rejected that argument, holding "while epidemiological evidence is helpful, it should not be held to be an absolute requirement in establishing causation." *Id.* at 5. It was enough for Bloomquist's doctors to testify that his medical problems were caused by the conditions in his workplace. *Id.* at 6. Similarly, Uhler lined up expert opinions from Dr. Stoken and Dr. Dodge that her worsened asthma could be traced to the Draynamite exposure at work. Under *Bloomquist*, summary judgment was improper.

The Graham Group claims that Uhler's reliance on *Bloomquist* is "misguided" because that case was decided seventeen years before *Ranes*. Yet *Ranes* did not overrule *Bloomquist*. In fact, *Ranes* cites *Bloomquist* with approval. *Ranes*, 778 N.W.2d at 693. So the majority should not cast it by the wayside. *See State v. Eichler*, 83 N.W.2d 576, 578 (Iowa 1957) ("If our previous holdings are to be overruled, we should ordinarily prefer to do it ourselves."); *see also Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 914 n.3 (Mich. 2000) ("[I]t is the Supreme Court's obligation to overrule or modify case law if it becomes obsolete, and until this Court takes such action, the Court of Appeals and all lower courts are bound by the authority." (citations omitted)). Because *Bloomquist* remains viable precedent, Uhler may rely on that standard in defending against summary judgment.

Because Uhler produced a submissible case on causation, the district court should not have granted summary judgment. Whether she can prevail on the merits remains to be seen, the Graham Group may be able to persuade the trier of fact of its position. But we must refrain from weighing the evidence and afford her every legitimate inference that can be deduced from the record. *See Clinkscales v. Nelson Sec., Inc.*, 697 N.W.2d 836, 841 (Iowa 2005). "Mere skepticism of a plaintiff's claim is not a sufficient reason to prevent a jury from hearing the merits of a case." *Id.*